Filed 10/6/23  In re Hunter G. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re Hunter G., a Person Coming Under the Juvenile Court Law. | B328244 (Los Angeles County Super. Ct. No. 20CCJP03534B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. C.G. and M.M., Defendants and Appellants. | |

APPEALS from orders of the Superior Court of Los Angeles County.  Gabriela H. Shapiro, Judge Pro Tempore.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant C.G.

Karen B. Stalter, under appointment by the Court of Appeal, for Defendant and Appellant M.M.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

This is parents' second appeal from the underlying juvenile dependency proceedings. The instant appeal involves Hunter G. (son), who was born during the pendency of this case and who is C.G. (father) and M.M.'s (mother) second child. The juvenile court terminated mother's and father's parental rights to son. On appeal, mother and father do not directly challenge the court's order terminating parental rights. Rather, father challenges the juvenile court's order summarily denying his section 388 petition, which order the court issued the same day it terminated parental rights. Father argues the court erred when it refused to hold a hearing on his section 388 petition and, therefore, the order terminating parental rights should be reversed and, on remand, an evidentiary hearing should be held on his section 388 petition. Mother argues, if we agree with father's position on appeal, we should reinstate her parental rights to son as well. Finding no error, we affirm.

## BACKGROUND

### 1.    First Appeal

The underlying proceedings began before son was born and when his older brother, Charles, was a newborn. At Charles's birth, he and mother both tested positive for drugs, including opiates. The juvenile court declared Charles a dependent of the court based on mother's and father's extended histories of drug

2

abuse and current drug use, including mother's drug use while pregnant with Charles. Eventually, after parents failed to participate in any court-ordered programs, the juvenile court terminated mother's and father's parental rights to Charles. Although mother and father both appealed the order terminating parental rights, they did not challenge the factual basis for that order. Instead, on appeal, mother and father challenged termination of their parental rights based on alleged errors made under the Indian Child Welfare Act (ICWA) (24 U.S.C. § 1901 et seq.) and related California law (Welf. & Inst. Code, § 224 et seq.). In a nonpublished opinion, we found no prejudicial error and affirmed. (*In re Charles G.* (Nov. 4, 2022, B318363).) We incorporate by reference our opinion in B318363.

**2.     Petition as to Son**

Son is mother and father's second child. He was born prematurely during the pendency of the underlying proceedings. At son's birth, mother tested positive for amphetamines, and mother and son both tested positive for opiates. Son was placed in the hospital's neonatal intensive care unit, where he remained for a few weeks. At the time, mother and father had been homeless for a year, had unsuccessfully participated in Suboxone programs to treat their opioid addictions, and each had a contagious blood infection and life-threatening disease, which resulted in their own hospitalizations. Father's medical condition was serious, and he remained hospitalized for over one month, awaiting heart surgery.

In August 2021, soon after son's birth, the Los Angeles County Department of Children and Family Services (Department) filed a Welfare and Institutions Code section 300

3

petition on behalf of son (petition).[1]  The petition alleged mother's and father's past and current drug abuse placed son at risk of serious harm, father knew of mother's substance abuse and failed to protect son from it, and son's brother Charles already was a dependent of the court receiving permanent placement services. The juvenile court detained son from mother and father and ordered monitored visitation.

Upon his release from the hospital, son was placed in foster care.  In early October 2021, son was placed with his current caregiver and prospective adoptive parent, Ms. J., who is a close friend of, and lives minutes away from, maternal aunt, who is the adoptive parent of son's brother Charles.  Throughout the underlying proceedings, and with the help of son's maternal grandmother, Ms. J. and maternal aunt ensured consistent and frequent visits between son and his brother Charles.

Prior to adjudication, mother had entered a rehabilitation program, but was asked to leave after two days because she brought amphetamines into the program.  After that, mother's whereabouts were unknown.  Although father remained hospitalized and needed heart surgery, around the same time mother left her rehabilitation program, father left the hospital against medical advice.  Mother and father were together and homeless in an unknown location.  In an October 2021 report for the court, a Department social worker indicated she had sporadic telephone contact with father and mother.  The parents were homeless and had been unable to enroll in any drug rehabilitation programs.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

4

In late October 2021, the juvenile court sustained in part and dismissed in part the petition. The court sustained two section 300, subdivision (b) counts related to parents' past and current drug use. The court dismissed the remaining counts.

At the dispositional hearing held months later in January 2022, the juvenile court declared son a dependent of the court and removed him from parents' custody and care. The juvenile court ordered that reunification services for mother and father be bypassed and that the case proceed to permanency planning. The court stated it was "not offering reunification services to the parents, pursuant to . . . [section] 361.5(b)(10), because the parents failed to make reasonable efforts to ameliorate their underlying actions with respect to their other child, as well as this child. And because the parents have demonstrated the chronic use of alcohol or drugs. And also because I just terminated parental rights for a sibling, who also is under the age of three." Parents did not challenge the juvenile court's jurisdictional findings or dispositional orders as to son.

3.    **Visits**

In the months between the adjudication and disposition hearings, parents rarely visited son and when they did their visits were always virtual. There was a span of approximately five to six months when parents did not visit son at all, and the Department was unable to locate mother and father. Parents' visits with son were always monitored.

In November 2021, father was arrested for an unknown misdemeanor. A few days later he was released from custody. At some point later, he was again incarcerated. Following his release from jail in August 2022, father began in-person visits with son (who was then one year old) three times a week and

5

sometimes also for holiday events. The Department reported father's visits with son went well. In August 2022, maternal grandmother reported mother and father "are very happy and loving with [son]. They typically share holding him the entire visit and they alternate sitting in the back seat when we are driving. They sing him a lullaby at the end of all their visits now." As of January 2023, maternal grandmother continued to give positive reports about mother's and father's visits with son. Maternal grandmother explained parents visited with son a few times a week for many hours at a time. They had started to change son's diaper, feed him, and put him down for naps.

Around the same time, however, Ms. J. stated her belief that neither mother nor father was fit to be a parent. Ms. J. said father lacked " 'any knowledge on how to be a parent' " and described him as " 'the cool uncle,' " "hyper," and "rambunctious." Similarly, father described himself as " 'the fun dad.' " When father attended a physical therapy session with son, Ms. J. reported father was "just too hyper and full of interruptions," all of which distracted son to the extent the session had to end early. Ms. J. also noted that, on one occasion, she asked father to be careful with son during a visit because son recently had undergone a medical procedure. During that visit, however, father threw son in the air to play with him. In February 2023, father brought loose Suboxone pills in his pocket to a visit at Ms. J.'s home. At some point, father lost the pills and thought they might have fallen out of his pocket during his visit and been accessible to children in the home. As a result, in-home visits were suspended. Ms. J. said son was attracted to father's " 'crazy energy' " and they had fun together. But, after visits with father,

6

son was " 'especially energetic' " and " 'more clingy' " with Ms. J. She indicated son did not ask for parents after visits.

Ms. J. believed maternal grandmother " 'is overinvolved and is pushing [mother and father] to remember to go to visits.' " Rather than mother or father, Ms. J. stated maternal grandmother was the person who initiated visits and asked about son's physical therapy sessions.

The Department consistently reported son had developed a strong bond with Ms. J. and was thriving in her care. Son called Ms. J. " 'mama' " and " 'constantly seeks for her.' " Conversely, the Department did not believe mother or father was a "source of emotional security, stability, or safety" for son.

4. **Section 388 Petitions and Termination of Parental Rights**

In March 2023, a few days before the permanency planning hearing, father and mother each filed a section 388 petition for modification, asking the juvenile court to order reunification services. In his section 388 petition, father stated he had "enrolled in and completed services to address the issues underlying this case" and had "secured stable employment." Father stated he believed the requested change (i.e., ordering reunification services) would be better for son because: Father "has successfully addressed the issues that brought this case before the court. He has been sober for 10 months, has enrolled in programs and services to address his history of substance abuse. Father has visited his son as often as possible and has maintained frequent phone and video contact when in-person visitation is not possible. Father has established a loving and enduring parental bond with his son."

On March 28, 2023, the juvenile court summarily denied father's and mother's section 388 petitions without a hearing. The court explained it denied hearings on the petitions because it could not "find that there is prima facia [*sic*] evidence of sufficient change. Or more importantly, even if the court could find change because the parents are demonstrating change, it's that the court cannot find that it would be in the best interest of the child."

That same day, the juvenile court terminated mother's and father's parental rights to son. Although mother and father both argued the beneficial parental relationship exception to adoption applied, the court disagreed. Among other things, the court found the attachment between parents and son was "one-way in the terms of the parents and their feelings and relationship to [son]" and, although son enjoyed his time with parents, "one could argue that any baby or any child who is being placed as the center of attention to any adults would be happy and enjoy that time." The court also noted there was no evidence showing son had "difficulty when the visitation [with parents] ends or that [son] is dis-regulated or that he otherwise has a difficult time not being in the care of the parents."

### 5. Appeals

Mother and father each appealed the juvenile court's order terminating their parental rights to son. Father also appealed the court's order summarily denying his section 388 petition.

### DISCUSSION

### 1. Father's Appeal

Father claims the juvenile court abused its discretion when it summarily denied his section 388 petition without a hearing. Father claims the court should have granted a hearing on his petition because he made a prima facie showing of both changed

8

circumstances and that the requested modification (i.e., ordering reunification services) would be in son's best interest. As a result, father argues we must reverse the denial of his section 388 petition as well as the court's order terminating his parental rights to son. As discussed below, we find no error.

### a. Applicable Law

"After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability.' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) Nonetheless, "[u]nder section 388, a parent may petition to modify a prior order 'upon grounds of change of circumstance or new evidence.' (§ 388, subd. (a)(1); see Cal. Rules of Court, rule 5.570(a).)" (*In re K.L.* (2016) 248 Cal.App.4th 52, 61.) " 'The burden . . . is on the parent to prove changed circumstances pursuant to section 388 to revive the reunification issue. Section 388 provides the "escape mechanism" that . . . must be built into the process to allow the court to consider new information.' " (*In re Zacharia D.* (1993) 6 Cal.4th 435, 447.) "Even after the focus has shifted from reunification, the scheme provides a means for the court to address a legitimate change of circumstances while protecting the child's need for prompt resolution of his custody status." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) Thus, "after reunification services have terminated, a parent's [section 388] petition for either an order returning custody or reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.) The parent's best interests "are simply no longer the focus." (*Ibid.*)

The juvenile court is not required to hold a full hearing on a section 388 petition.  "The parent seeking modification must 'make a prima facie showing to trigger the right to proceed by way of a full hearing.  [Citation.]'  [Citations.]  There are two parts to the prima facie showing:  The parent must demonstrate (1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the children.  [Citation.]  If the liberally construed allegations of the petition do not show changed circumstances such that the child's best interests will be promoted by the proposed change of order, the dependency court need not order a hearing." (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)  " 'While the petition must be liberally construed in favor of its sufficiency [citations], the allegations must nonetheless describe specifically how the petition will advance the child's best interests.'  [Citation.]  In determining whether the petition makes the required showing, the court may consider the entire factual and procedural history of the case." (*In re K.L.*, *supra*, 248 Cal.App.4th at p. 62.)

### b.     Standard of Review

"We review the juvenile court's summary denial of a section 388 petition for abuse of discretion." (*In re Anthony W.*, *supra*, 87 Cal.App.4th at p. 250.)  " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318–319.)

### c.     No Abuse of Discretion

We conclude the juvenile court did not abuse its discretion in concluding father failed to make a prima facie showing that

the requested modification would be in son's best interest. By the time father filed his section 388 petition, son was over one-and-a-half years old. Son had never lived with father. Instead, son had lived all but two months of his life with Ms. J., with whom it was undisputed he was bonded and in whose care he was thriving. Moreover, father started visiting son in earnest only approximately seven months before filing his section 388 petition. Son and father enjoyed their visits, but they were always monitored and, often, father was overly excited or rambunctious. For example, at least one visit (which occurred during one of son's physical therapy sessions) was cut short due to father's disruptive behavior. It was also reported father lacked basic parenting skills. Ms. J. described father as the "cool uncle," which description father echoed when he described himself as the "fun dad." Rather than evidencing a parent-child bond, the juvenile court determined son's attraction to father was rooted in son's young age and his enjoyment of being the center of attention. This was a reasonable interpretation of the evidence, which we do not disturb on appeal. (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318–319.)

In his section 388 petition, father stated that it was in son's best interest for the court to order reunification services because he had addressed issues that brought the case before the court, visited with son as often as possible, and "established a loving and enduring parental bond with his son." As the Department points out, however, "The presumption favoring natural parents by itself does not satisfy the best interests prong of section 388. The cases that state a child may be better off with his or her biological parent rather than with strangers do so when the biological parent has shown a sustained commitment to the child

11

and parenting responsibilities." (*In re Justice P.* (2004) 123 Cal.App.4th 181, 192.)  Simply, father did not " 'describe specifically how the petition will advance the child's best interests.' " (*In re K.L., supra,* 248 Cal.App.4th at p. 62.)

Thus, even assuming father made a prima facie showing of a genuine change in circumstances, the juvenile court did not abuse its discretion in summarily denying father's section 388 petition.  Father filed his section 388 petition late in the proceedings, at a time when son's stability was paramount.  Father failed to make a prima facie showing it would have been in son's best interest to delay permanency, open reunification services, and wait to see if father might at some future point be able to reunify.  (See *In re Mary G.* (2007) 151 Cal.App.4th 184, 206.)  " ' " 'Childhood does not wait for the parent to become adequate.' " ' " (*Ibid.*)  In light of the entire record, we find no abuse of discretion.

**2.    Mother's Appeal**

Although the juvenile court also summarily denied mother's section 388 petition without a hearing, mother did not appeal that order.  Mother appealed only the court's order terminating her parental rights.  In conclusory fashion, mother states that, if we agree with father's arguments on appeal, we should reinstate her parental rights as to son.  Because we do not agree with father's position on appeal, mother's appeal fails as well.

## DISPOSITION

The juvenile court's March 28, 2023 orders are affirmed.

NOT TO BE PUBLISHED.


                                        KWAN, J.*

We concur:



ASHMANN-GERST, Acting P. J.



HOFFSTADT, J.

---

    **\*** Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.